IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONALD GROCHOWSKI
as a representative administrator of
the estate of Kenneth Grochowski,
deceased, et al.,

    Plaintiffs,

      v.

    CIVIL ACTION FILE
    NO. 1:14-CV-2586-TWT

CLAYTON COUNTY, GEORGIA
is sued through its Chair Jeffrey E.
Turner, and Commissioners in their
official capacity, and through the
Sheriff Kemuel Kimbrough, in his
official capacity, individually and
jointly, et al.,

    Defendants.

## OPINION AND ORDER

This is a civil rights action. It is before the Court on the Defendants

CorrectHealth, LLC, James Rose and Walter Smith's Motion for Summary

Judgment [Doc. 137]; the Defendants Clayton County, Kemuel Kimbrough,

Garland Watkins, Robert Sowell, and Samuel Smith's Motion for Summary

Judgment [Doc. 138]; and the Plaintiffs' Motion for Partial Summary Judgment

[Doc. 139]. For the reasons set forth below, (1) the Defendants CorrectHealth,

LLC, James Rose and Walter Smith's Motion for Summary Judgment [Doc. 137]

is GRANTED; (2) the Defendants Clayton County, Kemuel Kimbrough, Garland

Watkins, Robert Sowell, and Samuel Smith's Motion for Summary Judgment [Doc. 138] is GRANTED; and (3) the Plaintiffs' Motion for Partial Summary Judgment [Doc. 139] is DENIED.

## I. Background

This case arises from the death of the Plaintiffs' decedent, Kenneth Grochowski, at the hands of William Alexander Brooks while both men were detained at the Clayton County Jail. Twenty year old William Alexander Brooks was arrested on July 31, 2012.[1] He was charged with misdemeanor offenses of theft by receiving stolen property, giving a false name to an officer, driving on a suspended license, and not wearing a seatbelt.[2] Brooks was booked into the Jail on August 1, 2012.[3] Brooks underwent an initial medical assessment conducted by the Defendant CorrectHealth's employees.[4] CorrectHealth is a private entity that contracts with Clayton County to provide health care to inmates and pre-trial detainees held at the Jail.[5] During the assessment, Brooks self-reported no past or current physical or mental health issues and denied any

---

[1]     County and Supervisory Defendants' Statement of Material Facts ¶ 1 [Doc 138-2].

[2]     *Id.*

[3]     *Id.* ¶ 2.

[4]     *Id.* This included physical and mental assessments by the trained nursing staff and review by a physician assistant.

[5]     Compl. ¶ 90 [Doc. 1].

history of violent behavior.[6] The CorrectHealth employees conducting the assessment concluded that Brooks' vital signs, general appearance, attitude, and affect were all within normal limits.[7] Therefore, Brooks was cleared for housing within the general population.[8]

The classification officer on duty at the time, Officer Lashanda Baker, completed Brooks' Classification Form.[9] Officer Baker reviewed Brooks' criminal history and determined that Brooks had no violent felony convictions, no escape history, and no past or present institutional or behavioral problems.[10] Therefore, Officer Baker classified Brooks as a medium security inmate.[11] There is no evidence that any of the individual Defendants were aware (as alleged in the Complaint) of any erratic behavior by Brooks prior to August 14, 2012.

Fifty-seven year old Kenneth Grochowski was arrested on August 8, 2012, and charged with failure to appear on a DUI charge in Illinois.[12] He was booked

---

[6]    CorrectHealth's Statement of Material Facts ¶ 9 [Doc. 137-4].

[7]    *Id.* ¶¶ 11-12.

[8]    *Id.* ¶ 17.

[9]    County and Supervisory Defendants' Statement of Material Facts ¶ 4.

[10]    *Id.* The criminal history and current charges of an inmate are not provided to the medical staff by the jail security staff.

[11]    *Id.*

[12]    *Id.* ¶ 5.

into the Jail the same day.[13] Grochowski underwent a medical assessment and was cleared for housing within the general population.[14] Officer Baker completed his Classification Form and classified him as a medium security inmate.[15]

Brooks and Grochowski were housed in the same cell beginning August 11, 2012.[16] On August 14, 2012, at or around 9:05 pm, Brooks began beating Grochowski until he was unconscious, and forcefully placed Grochowski's head in the toilet in an attempt to drown him.[17] Another inmate alerted jail staff of the assault, and Grochowski was found unresponsive in his cell.[18] Grochowski was transported to Southern Regional Medical Center where he was pronounced dead the morning of August 15, 2012.[19]

The Jail was designed to house two inmates per cell.[20] There are ninety-six cells and a central control tower in each of the Jail's eight Housing

---

[13]     *Id.* ¶ 6.

[14]     *Id.* ¶ 7.

[15]     *Id.* ¶ 8.

[16]     *Id.* ¶ 10.

[17]     *Id.* ¶ 12.

[18]     *Id.* ¶¶ 13-15.

[19]     *Id.* ¶ 18.

[20]     County and Supervisory Defendants' Statement of Material Facts ¶ 25.

Units.[21] The cells have a solid door with a small window.[22] Two corrections officers are assigned to each Housing Unit per shift, one in the control tower and one on the floor.[23] The parties dispute whether the officer stationed in the control tower can see into the cells.[24] Each cell, including the one that housed Brooks and Grochowski, is equipped with an emergency call button.[25] It is the policy of the Jail to conduct physical cell checks every hour and headcounts three times a day.[26] The corrections officers on duty followed these policies on the night of the assault.[27]

---

[21]     *Id.* ¶¶ 23-24.

[22]     *Id.* ¶ 27.

[23]     *Id.* ¶ 37.

[24]     The Defendants claim that the officer in the control tower has a "clear view" of some of the cell's interior but cannot see the entire cell. *Id.* ¶ 28. The Plaintiffs claim that the officer in the control tower cannot see into the cell at all. Pls.' Resp. to County and Supervisory Defendants' Statement of Material Facts ¶ 28 [Doc. 171].

[25]     Pls.' Resp. to County and Supervisory Defendants' Statement of Material Facts ¶ 32.

[26]     County and Supervisory Defendants' Statement of Material Facts ¶ 39. The Plaintiffs dispute that this policy is always followed, *see* Pls.' Resp. to the County and Supervisory Defendants' Statement of Material Facts ¶ 39, but do not dispute that the policy was followed on the night of the assault, see *id.* ¶ 19.

[27]     County and Supervisory Defendants' Statement of Material Facts ¶ 19.

The Plaintiffs, the decedent's adult children, filed this action on August 11, 2014.[28] The Plaintiffs named as defendants the County; CorrectHealth and various employees; the Sheriff; and various supervisors and corrections officers employed by the Sheriff's Office.[29] At this stage in the litigation, the Plaintiffs have abandoned all claims against non-supervisory jail personnel, as well as those against CorrectHealth's employees. Therefore, the remaining Defendants are the County, CorrectHealth, the Sheriff, and three jail supervisors who, it is alleged, are responsible for the day-to-day administration of the Jail. The Sheriff and the jail supervisors are collectively referred to as the "Supervisory Defendants" in this Order. These Defendants and the Plaintiffs move for summary judgment.

## II. Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.[30] The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.[31] The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material

---

[28] Compl. ¶ 4.

[29] *Id.*

[30] Fed R. Civ. P. 56(c).

[31] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).

fact.[32] The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists.[33]

## III. Discussion

This Order will review each Defendant's potential liability in turn, beginning with CorrectHealth.

### A. CorrectHealth

In their Complaint, the Plaintiffs allege that the "acts, omissions, policies, and customs" of CorrectHealth and its employees resulted in violations of the decedent's Eighth and Fourteenth Amendment rights, including "the right to be free of cruel and unusual punishment, the right to be protected, and the right to medical care while incarcerated."[34] The Plaintiffs appended a state law negligence claim to their § 1983 claim, alleging that CorrectHealth's employees breached their duty to the decedent by failing to perceive or mitigate the danger that Brooks posed to other detainees.[35] The Plaintiffs have abandoned all claims against CorrectHealth employees, and this Court holds that the remaining

---

[32] *Celotex Corp. V. Catrett*, 477 U.S. 317, 323-24 (1986).

[33] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

[34] Compl. ¶ 126.

[35] First Am. Compl. ¶ 9 [Doc. 4].

CorrectHealth employees should be dismissed from this action.[36] This Court is called upon to determine whether summary judgment is appropriate as to the Plaintiffs' claims against CorrectHealth as a private entity.

### 1. § 1983 Claim

CorrectHealth is amenable to suit under § 1983 because it has contracted to perform a function "traditionally within the prerogative of" the County, namely the provision of medical care to incarcerated persons.[37] Therefore, this Court will treat CorrectHealth as the "functional equivalent" of a municipality for the purposes of determining its liability under § 1983. There is no respondeat superior liability for a municipality under section 1983. A municipality can be liable under § 1983 only when execution of its official "policy or custom" is the "moving force" behind a constitutional violation.[38] A municipality is liable only for policies promulgated or ratified by officials with "final policymaking authority."[39] A municipality cannot be liable for the acts of officials that it has no authority to control.[40]

---

[36]    Consent Stipulation for Dismissal [Doc. 28]; Pls.' Reply Br. to CorrectHealth's Mot. for Summ. J., at 1 n.1 [Doc. 176].

[37]    *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997).

[38]    *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).

[39]    *Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996).

[40]    *Grech v. Clayton Cty.*, 335 F.3d 1326, 1331 (11th Cir. 2003) (citing *Turquitt v. Jefferson County*, 137 F.3d 1285 (11th Cir. 1998)).

CorrectHealth contends that none of its policies or customs were the moving force behind the constitutional violations alleged by the Plaintiffs. CorrectHealth asserts that the physical and mental health assessment performed on Brooks by its employees met the relevant standard of care and that the test results indicated no need for an immediate mental health referral.[41] CorrectHealth further asserts that neither CorrectHealth nor its employees have any input in detainees' security classifications or where they are housed in the facility.[42] The Plaintiffs do not dispute the truth of any of CorrectHealth's proffered facts. Rather, they contend that the quality of care provided to Brooks is immaterial because Brooks' initial assessment was "inadequate for purposes of classification and assessment of assaultive tendencies to determine suitability for double-celling."[43] It appears from Plaintiffs' briefing that the "policy or custom" complained of is the double-celling of detainees without adequate safeguards to prevent inmate-on-inmate violence.

The Plaintiffs' theory of liability fails as a matter of law because CorrectHealth plays no role in setting classification policies for the Jail and lacks the authority to do so. The parties agree that neither CorrectHealth nor

---

[41]    CorrectHealth's Mot. For Summ. J., at 10 [Doc. 137-1].

[42]    CorrectHealth's Reply Br. in Supp. of Mot. For Summ. J., at 2 [Doc 181].

[43]    Pls.' Resp. to CorrectHealth's Statement of Material Facts in Supp. of Mot. For Summ. J., at 11-15 [Doc. 176-1].

its employees have any input in classification or housing decisions.[44] The Sheriff

and his subordinates are solely responsible for setting classification policy. In

his capacity as jail administrator, the Sheriff acts as an arm of the state and is

not subject to the control of the County or to entities operating on County-

delegated authority.[45] Because CorrectHealth exercises no control over the policy

maker responsible for setting classification policy, CorrectHealth cannot be

liable under § 1983.[46]

The Plaintiffs seek to establish CorrectHealth's responsibility to assess

detainees for security risks by pointing to language in the County's 2008

Request for Proposal.[47] That document suggests that the health care provider

will have "primary, but not exclusive responsibility for all the identification, care

and treatment of inmates who are 'security risks' or who present a danger to

---

[44]     CorrectHealth's Reply Br. in Supp. of Mot. for Summ. J., at 2 [Doc 181]; *accord* Pls.' Resp. Br. to CorrectHealth's Mot. for Summ. J., at 5 n.8 [Doc. 176] ("CorrectHealth personnel did not provide 'any input' for the Sheriff employee's decisions as to 'medium or maximum security and room assignment,' which was 'completely up to' the Sheriff's employees.") (citing Pedersen Decl. ¶ 31 [Doc. 137-2]).

[45]     *Purcell ex rel. Estate of Morgan v. Toombs Cty., Ga*, 400 F.3d 1313, 1325 (11th Cir. 2005) (citing *Manders v. Lee*, 338 F.3d 1304, 1315 (11th Cir. 2003)).

[46]     *See Grech*, 335 F.3d at 1343 (holding that local government entities cannot be liable for the acts of the Sheriff over which it has no control).

[47]     *See* Doc. 173-2.

themselves and others."[48] But whether or not the County actually sought to assign CorrectHealth primary responsibility to conduct risk assessments is beside the point. Final decisions on classification and housing decisions rest with the Sheriff as a matter of law.[49] Because the County itself has no authority to control the Sheriff in his capacity as jail administrator, it follows that the County could not delegate such authority to a private entity by contract. The contractual language at issue cannot establish that officials subject to CorrectHealth's control had, or should have had, the authority to set classification and housing policies in the Jail. Therefore, CorrectHealth's contract with the County cannot sustain a finding of liability under § 1983.

## 2. State Law Negligence Claim

CorrectHealth argues that it is not liable for negligence under Georgia law because Brooks' health screening met the standard of care and because the Defendant had no input into classification or housing decisions at the Jail.[50] The Plaintiffs provide no response to CorrectHealth's arguments in their reply briefing. Indeed, the Plaintiffs did not address their state law negligence claims at all in their response brief. Therefore, this Court finds that the Plaintiffs have

---

[48]    Pls.' Resp. to CorrectHealth's Statement of Material Facts, at 11 (citing Request for Proposal, at 30 [Doc. 173-2]).

[49]    *Purcell*, 400 F.3d at 1325.

[50]    CorrectHealth's Mot. For Summ. J., at 15-16.

abandoned their state law negligence claim.[51] In any event, the Plaintiffs'

negligence claim was premised on the idea that CorrectHealth's failure to assign

a heightened security classification to Brooks caused harm to the decedent.

Undisputed facts in the record establish that CorrectHealth had no duty to and

did not participate in classification decisions. Thus, the Plaintiffs cannot

establish a prima facie case for negligence against CorrectHealth and the claim

fails as a matter of law.

### B. Supervisory Defendants

The Plaintiffs sued the Supervisory Defendants in their individual and

official capacities for "acts, omissions, policies, and customs" that they allege

violated the decedent's rights secured by the Eighth and Fourteenth

Amendments.[52] In its Order of Dismissal, this Court dismissed all claims against

the Supervisory Defendants in their official capacities except for those

concerning inadequate provision of medical care.[53] As for the claims against the

Supervisory Defendants in their individual capacities, this Court dismissed the

Plaintiffs' failure to train claim but did not dismiss the Plaintiffs' claims

---

[51]     *See Gore v. Jacobs Eng'g Grp.*, 706 F. App'x 981, 986 (11th Cir. 2017) ("[F]ailure to brief and argue [an] issue during the proceedings before the district court is grounds for finding that the issue has been abandoned.") (citing *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000)).

[52]     Compl. ¶ 115. The rights identified by the Plaintiffs included the right to be free from cruel and unusual punishment, the right to be protected, and the right to medical care while incarcerated.

[53]     Order of Dismissal, at 8 [Doc. 57].

concerning the Supervisory Defendants' personal participation in a constitutional violation.[54] The Plaintiffs subsequently amended their complaint to add claims for conditions of confinement that violated the decedent's right not to be punished prior to adjudication of guilt.[55] The Plaintiffs also added a § 1983 claim on their own behalf for loss of familial association.[56] At summary judgment, the Supervisory Defendants request Eleventh Amendment immunity for the claims against them in their official capacities and qualified immunity for the claims against them in their individual capacities.[57]

The claim for loss of familial association is easily resolved. The County and the Supervisory Defendants raised defenses to this claim in their briefing to which the Plaintiffs failed to respond.[58] The Plaintiffs have therefore abandoned this claim and it is dismissed accordingly.[59] As for the remaining claims, this Court holds that the Supervisory Defendants are entitled to immunity for the reasons provided below.

### 1. Official Capacity Claims

---

[54] *Id.*, at 10-11.

[55] Second Am. Compl. ¶¶ 67-88 [Doc. 73].

[56] Second Am. Compl. ¶ 89.

[57] County and Supervisory Defendants' Mot. for Summ. J., at 12-22.

[58] *Id.* at 22-23.

[59] *See Gore*, 706 F. App'x at 985.

T:\ORDERS\14\Grochowski\msjtwt.wpd          -13-

Failure to provide medical care is the sole remaining claim against the Supervisory Defendants in their official capacities.[60] The Supervisory Defendants contend that the medical care that Brooks and the decedent received at initial intake was not constitutionally defective and that, in any event, the Plaintiffs have provided no evidence that the Supervisory Defendants were deliberately indifferent to the allegedly deficient medical care.[61] The Supervisory Defendants have established sufficient grounds to make the official capacity claims against them subject to summary adjudication, and the Plaintiffs do not substantively respond to the Supervisory Defendants' arguments regarding the sufficiency of the medical care provided to Brooks and the decedent. As such, the claim against the Supervisory Defendants in their official capacities should be dismissed.

Although it is not clear from the Plaintiffs' briefing, the Plaintiffs could be arguing that the Supervisory Defendants are liable because the results of inmates' medical screening are not taken into account during the classification and housing process. As this Court already explained in its Order of Dismissal, however, the Supervisory Defendants are entitled to Eleventh Amendment immunity for all claims pertaining to jail administration, which includes classification and housing decisions.[62] Because the Plaintiffs allege that the

---

[60]     Order of Dismissal, at 8.

[61]     County and Supervisory Defendants' Mot. for Summ. J., at 12-13.

[62]     Order of Dismissal, at 8.

harm arose from the Jail's classification system rather than from the medical care itself, the Plaintiffs cannot sustain their claims regarding inadequate provision of medical care against the Supervisory Defendants in their official capacities.

## 2. Individual Capacity Claims

The Supervisory Defendants argue that they are entitled to qualified immunity for the section 1983 claims brought against them in their individual capacities. Qualified immunity exempts an officer from section 1983 liability under certain circumstances.[63] To be entitled to qualified immunity in the Eleventh Circuit, an officer must show that he was acting within the scope of his discretionary authority at the time of the alleged wrongful acts.[64] Once the officer has proved that he was within the scope of his discretionary authority, the plaintiff must show that the officer violated "clearly established statutory or constitutional rights of which a reasonable person would have known."[65] In order to establish that a reasonable officer would have known of a right, a plaintiff must show development of law in a "concrete and factually defined context" such that a reasonable officer would know that his conduct violated federal law.[66] Two questions are central to the qualified immunity defense. First,

---

[63]     *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

[64]     *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

[65]     *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[66]     *Jackson v. Sauls*, 206 F.3d 1156, 1164-65 (11th Cir. 2000).

the Court must determine whether there was a violation of a constitutional right.[67] Second, the Court must then determine whether the right was clearly established.[68] There is no dispute that the Supervisory Defendants were acting within the scope of their discretion at all times relevant to this suit.[69] Therefore, the burden is on the Plaintiffs to establish that the Supervisory Defendants violated clearly established law.

### a. Constitutional Violation

A jail supervisor may be liable under § 1983 when that supervisor personally participates in a constitutional deprivation or when there is a causal connection between the supervisor's acts and the constitutional deprivation.[70] When considering the claims of pretrial detainees, liability can attach when a "prison official's deliberate indifference to a known, substantial risk of serious harm violates the [Fourteenth] Amendment."[71] A showing of deliberate indifference requires "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence."[72]

---

[67]    *Hope v. Pelzer*, 536 U.S. 730, 736-42 (2002).

[68]    *Lee*, 284 F.3d at 1194.

[69]    Compl. ¶ 6; County and Supervisory Defendants' Mot. for Summ. J., at 19 n.3.

[70]    *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990).

[71]    *Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1047 (11th Cir. 2014).

[72]    *Id.* at 1047.

Although the Plaintiffs alleged in their original complaint that the Supervisory Defendants personally participated in the decision to house Brooks with the decedent,[73] the Plaintiffs appear to have dropped that line of argument at summary judgment. Therefore, the question before this Court is whether the Supervisory Defendants' policies or practices caused the decedent to be deprived of his constitutional rights.[74]

The Plaintiffs identify various policies and practices that they allege violated the decedent's constitutional rights. First, they allege that the Jail was designed such that all detainees are double-celled without continuous observation by the jail staff.[75] Second, they allege that the Jail was underfunded and understaffed, preventing jail staff from single-celling assaultive detainees and conducting continuous rounds.[76] Third, they allege that the screening, classification, and cell-assignment processes were "grossly inadequate" and resulted in non-violent detainees being housed with violent detainees.[77] Fourth, they allege that the Defendants had a "practice" of failing to prevent in-cell

---

[73]     Compl. ¶¶ 31-33. The Plaintiffs alleged that the Supervisory Defendants personally observed "erratic behavior" displayed by Brooks but failed to make any changes to his security designation or housing assignment.

[74]     *Keith*, 749 F.3d at 1048.

[75]     Pls.' Resp. Br. to County and Supervisory Defendants' Mot. for Summ. J., at 2.

[76]     *Id.*

[77]     *Id.* at 3.

assaults because they did not investigate or seek to change the conditions that gave rise to previous in-cell assaults.[78]

The Plaintiffs insist that these policies and practices constitute "conditions of confinement" that should be analyzed under the objective test articulated by the Supreme Court in *Bell v. Wolfish*.[79] The Supreme Court held in *Bell* that conditions claims brought by pretrial detainees arise under the Fourteenth Amendment, which prohibits punishment prior to the adjudication of guilt.[80] A condition of confinement violates the Fourteenth Amendment if it is imposed with the intent, express or inferred, to punish the pretrial detainee.[81] The Eleventh Circuit, however, has held that the decisional law applicable to prison inmates applies equally to pretrial detainees.[82] As a result, the Eleventh Circuit has required plaintiffs challenging conditions of confinement to show both that the deprivation suffered was objectively serious and that prison officials were deliberately indifferent to the violation of the plaintiff's

---

[78]   *Id.* at 4.

[79]   441 U.S. 520 (1979); Pls.' Mot. for Partial Summ. J., at 1-2 [Doc. 142] (arguing that the *Bell* standard applies to the Plaintiffs' claims).

[80]   *Bell*, 441 U.S. at 535-36.

[81]   *Id.* at 538-40.

[82]   *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1574 (11th Cir. 1985); *see also Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996).

constitutional rights.[83] The Plaintiffs argue that the recent Supreme Court case *Kingsley v. Hendrickson* abrogates Eleventh Circuit precedent such that the Plaintiffs need only satisfy *Bell*'s objective standard without a showing of deliberate indifference.[84]

The Plaintiffs' argument regarding the reach of *Kingsley* is unpersuasive. The Eleventh Circuit has thus far declined to apply *Kingsley* beyond the excessive force context in which it arose, despite opportunities to do so.[85] The Plaintiffs give this Court no compelling reason to depart from decades of binding case law establishing that plaintiffs must show deliberate indifference in prison conditions cases. This Court need not reach the question of whether the Supervisory Defendants were deliberately indifferent, however, because none of the challenged policies created an objectively substantial risk of serious

---

[83]     *See Evans v. St. Lucie Cty. Jail*, 448 F. App'x 971, 973–75 (11th Cir. 2011) (requiring that a pretrial detainee bringing a prison conditions case show that (1) the deprivation was "sufficiently serious" and (2) prison officials had a "sufficiently culpable state of mind") (citations omitted).

[84]     135 S. Ct. 2466 (2015); Pls.' Mot. for Partial Summ. J., at 8-9 (arguing that the Plaintiffs need not show that the defendants were deliberately indifferent in prison conditions cases).

[85]     *See Nam Dang ex rel Vina Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (declining to extend *Kingsley's* holding to a pretrial detainee's claim of inadequate medical treatment); *see also Collins v. Bates*, No. 2:14-CV-231-WHA, 2017 WL 4054160, at *4 (M.D. Ala. Aug. 4, 2017) (compiling cases in which the Eleventh Circuit has applied the deliberate indifference standard to prison conditions cases brought by pretrial detainees post-*Kingsley*), *report and recommendation adopted*, No. 2:14-CV-231-WHA, 2017 WL 3951601 (M.D. Ala. Sept. 8, 2017).

harm.[86] Nor do the facts support the inference that any of the policies were implemented with the intent to punish inmates at the Jail.

The Plaintiffs criticize the Jail's "objective" classification process on the grounds that classification officers do not conduct face-to-face interviews with inmates and do not consider violent misdemeanors.[87] As a result, the Plaintiffs argue, inmates with assaultive tendencies are double-celled with non-violent inmates, making in-cell assaults substantially more likely.[88] The Plaintiffs cite case law standing for the proposition that classification systems cannot be random and must at least consider inmates' capacity for violence.[89] Although jail administrators must consider an inmate's capacity for violence during the classification process, it is not the role of the judiciary to second-guess administrative decisions about which indicators should be considered and how they should be weighed. This Court is mindful of the Supreme Court's admonition that jail administrators "should be accorded wide-ranging deference

---

[86]     *Keith*, 749 F.3d at 1047 ("Whether a risk of harm is substantial is an objective inquiry.") (citing *Marsh v. Butler Cty., Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001)).

[87]     Pls.' Mot. for Partial Summ. J., at 16-18.

[88]     *Id.*

[89]     *Cf. Gates v. Collier*, 501 F.2d 1291, 1308 (5th Cir. 1974) ("The inmates are not classified according to the severity of their offense, resulting in the intermingling of inmates convicted of aggravated violent crimes with those who are first offenders or convicted of nonviolent crimes."); *Jensen v. Clarke*, 94 F.3d 1191, 1199 (8th Cir. 1996) ("random" assignment of inmates based only on space availability created a substantial risk of harm).

in adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."[90] The classification system in place at the Jail takes into account various security-related factors, including the inmates' history of violent felonies and disciplinary records from previous detentions at the facility.[91] The Plaintiffs put forward several recommendations for how the classification process could be changed to better detect an inmate's propensity for violence. But the dispositive question is not whether the classification system could be improved.[92] Rather, the question is whether the existing system falls below what the Constitution minimally requires.[93] Even assuming that these incidents could be fairly traced to the Jail's classification system, a few isolated events from several

---

[90] *Bell*, 441 U.S. at 547.

[91] County and Supervisory Defendants' Statement of Material Facts in Supp. of Mot. for Summ. J. ¶ 33.

[92] *Bell*, 441 U.S. at 562 ("The first question to be answered is not whose plan is best, but in which branch of the Government is lodged the authority to initially devise the plan… [T]he inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution[.]").

[93] Pls.' Additional Statement of Material Facts ¶¶ 1-3. The Plaintiffs in fact identify six in-cell fights that occurred between May 12, 2007 and April 24, 2009. For two of these fights, however, the Plaintiffs provide no information as to the participants' criminal histories. *Id.* ¶¶ 4-5. As for the altercation between Antonio Raspberry and Bruce Goodman, see *id.* ¶ 6, that incident occurred in administrative segregation, not general population, and is therefore of little relevance to the case at bar. *See Goodman v. Kimbrough*, 718 F.3d 1325, 1329 (11th Cir. 2013).

years prior are simply not enough to establish a causal connection between the challenged classification system and the allegedly unsafe conditions at the Jail.[94] The Plaintiffs further assert that at least 115 in-cell assaults occurred in the Jail between 2010 and 2012.[95] The County and the Supervisory Defendants have objected to the methodology by which the Plaintiffs came by their figures and the manner in which it has been presented to this Court.[96] Even if the Plaintiffs' numbers are correct, however, the Plaintiffs do not identify which, if any, of these assaults would not have occurred but for the inadequate classification system. The evidence provided by the Plaintiffs could not persuade a reasonable factfinder that the Supervisory Defendants' classification policies created an objectively serious risk of harm.

The Plaintiffs' evidence concerning the Jail's supervision policies is similarly insufficient. As with the classification system, the Plaintiffs put forward several means by which the inmate supervision could be improved. The Plaintiffs suggest that cell doors could have larger windows; that audio or video monitoring devices could be installed in each cell; or that more corrections

---

[94] A history of widespread abuse can put the supervisory official on notice of the need to take corrective action. *Brown*, 906 F.2d at 671. But "the deprivations that constitute widespread abuse... must be obvious, flagrant, and of continued duration, rather than isolated occurrences." *Id.*

[95] Pls.' Mot. for Partial Summ. J., at 14.

[96] *See* Notice of Objection to Pls.' Summary Chart [Doc. 165]; County and Supervisory Defendants' Reply Br. in Support of Mot. for Summ. J., at 10-11.

officers could be assigned to each shift.[97] These suggestions appear designed to achieve the goal of continuous or near-continuous supervision of cell interiors. But the Plaintiffs do not provide, and this Court is unaware of, any cases holding that continuous supervision of double-celled inmates is required by the Constitution. Identifying the minimal constitutional requirements for inmate supervision is challenging because of the fact-specific nature of prison conditions cases. Eleventh Circuit precedent, however, would appear to set the bar well below the conditions challenged in this case. In *Popham v. City of Talladega*, the widow of a man who committed suicide while detained in a city jail brought suit against jail officials for failure to protect and properly monitor her decedent.[98] The portion of the cell in which the suicide occurred was not in view of the jail's video monitoring system, and no jail staff were on duty to conduct physical checks.[99] The Eleventh Circuit nevertheless rejected the claim, noting that the plaintiff had "cite[d] no cases for the proposition that deliberate indifference is demonstrated if prisoners are not seen by jailers at all times."[100] In *Cagle v. Sutherland*, the Eleventh Circuit held that a one hour forty minute gap between cell checks did not amount to deliberate indifference, notwithstanding a

---

[97] Pls.' Resp. to County and Supervisory Defendants' Statement of Material Facts ¶¶ 29-30, 38.

[98] 908 F.2d 1561, 1563 (11th Cir. 1990).

[99] *Id.* at 1565.

[100] *Id.*

previous consent decree mandating hourly cell checks at the prison.[101] The Eleventh Circuit noted that the consent decree "did not establish a constitutional right to hourly jail checks" strongly suggesting that, in the Eleventh Circuit's view, even hourly cell checks are not constitutionally required.[102] The out-of-circuit cases that the Plaintiffs marshal in support of the contrary proposition do not go so far as to require continuous observation and, in any event, present factual scenarios quite distinct from the case before this Court.[103] The Plaintiffs' evidence is not sufficient to show that lack of continuous observation deprived any inmate of his or her constitutional rights.

In addition to the Jail's classification and supervision policies, the Plaintiffs challenge what they characterize as a "policy of allowing in-cell

---

[101]    334 F.3d 980, 989 (11th Cir. 2003).

[102]    *Id.*

[103]    In *Lareau v. Manson*, the Second Circuit adopted the magistrate judge's finding that double celling inmates without providing adequate means of contacting guards violates the Eighth Amendment. 651 F.2d 96, 108 n.11 (2d Cir. 1981). The record on appeal is silent as to the frequency of physical cell checks (or even whether such checks occurred at all) or the presence or absence of emergency call buttons in the cell. And, even taking into account the magistrate judge's findings, the Second Circuit concluded that holding pretrial detainees in such conditions was constitutionally permissible for a period of 15 days or less. *Id.* at 105. In *Hart v. Sheahan*, the Seventh Circuit considered a case in which jail staff did not observe inmates for a period of forty eight to fifty consecutive hours while the staff conducted weapons and contraband checks in different sections of the jail. 396 F.3d 887 (7th Cir. 2005). The remarkable and easily distinguishable facts in that case make it wholly unhelpful in addressing the issues presently before this Court.

assaults to go un-prevented."[104] While the Plaintiffs list this policy as a condition of confinement subject to review under the *Bell v. Wolfish* standard, it is difficult to conceptualize how the failure to investigate the causes of previous in-cell assaults could be a "condition" imposed on current detainees. In their briefing, the Plaintiffs assert that this policy "reeks of deliberate indifference"—apparently arguing that the supervisors were deliberately indifferent to an excessive risk of inmate-on-inmate violence.[105] The evidence to support this allegation is thin at best. Jail officials are not the guarantors of inmate safety.[106] In order to establish that inmate-on-inmate violence is excessive, the Plaintiffs must show that "violence and terror reign" at the Jail.[107] Inmates must be exposed to a near-constant threat of violence.[108] The Plaintiffs assert that there had been 115 in-cell assaults over a period of about three years leading up to the attack.[109] The Plaintiffs further assert that the rate of in-cell assaults is "high" in proportion to the total number of assaults over the same

---

[104]    Pls.' Resp. Br. to County and Supervisory Defendants' Mot. for Summ. J., at 3.

[105]    *Id.* at 16.

[106]    *Popham*, 908 F.2d at 1564.

[107]    *Purcell*, 400 F.3d at 1320.

[108]    *Id.*

[109]    Pls.' Mot. for Partial Summ. J., at 14.

period.[110] But, even if the Plaintiffs have the numbers right, an in-cell assault rate of roughly thirty eight per year is not sufficient to show that the "violence and terror reign" at the Jail or that inmates are subject to a "constant threat of violence." It is not incumbent on the Supervisory Defendants to investigate the root causes of every in-cell assault, particularly when the incident records relied on by the Plaintiffs show that the perpetrators of the assaults are quickly identified and appropriate disciplinary action is taken. The Plaintiffs make much of the case *Goodman v. Kimbrough*, in which the Sheriff was sued in his official capacity after a detainee was brutally beaten by his cell-mate while in administrative segregation.[111] But the constitutional adequacy of the Jail's classification and supervision policies were not at issue in the case. On the contrary, it was deviations from official policy–namely deactivating emergency call buttons and failing to conduct cell checks and head counts–that gave rise to claims in *Goodman*.[112] There is no sense in which *Goodman* could have put the Supervisory Defendants on notice of a substantial risk posed by their classification and supervision policies. Thus, the Supervisory Defendants cannot as a matter of law be liable for their alleged policy of "allowing in-cell assaults to go unprevented."

---

[110]     *Id.*

[111]     *Goodman*, 718 F.3d at 1329.

[112]     *Id.* at 1335 ("Goodman does not allege that any official Sheriff's Department policy violated his constitutional rights.").

Because this Court concludes that none of the challenged policies give rise to an objectively substantial risk of serious harm as a matter of law, it is perhaps redundant to consider whether these policies constitute unconditional conditions of confinement as urged by the Plaintiffs. Regardless, the Plaintiffs cannot prevail even by application of their preferred standard. There is nothing on the record to suggest that the Supervisory Defendants implemented the aforementioned policies with the express intent to punish detainees. Thus, in order to prevail the Plaintiffs must show that the challenged conditions are not reasonably related to any legitimate penological purpose. The factfinder would then be permitted, but not required, to draw the inference that the conditions were imposed with the intent to punish detainees. In this case, the Jail's classification, supervision, and housing policies are clearly related to the Supervisory Defendants' legitimate penological interests in "preserv[ing] internal order and discipline and to maintain institutional security."[113] This Court declines the Plaintiffs' invitation to view each absence of some additional safety measure as a condition of confinement that itself must further a penological interest. Insofar as the absence of additional safeguards requires explanation, the Supervisory Defendants supply penological interests, like ensuring that classification systems are unbiased and protecting inmate privacy,

---

[113]    *Bell*, 441 U.S. at 547.

that the Plaintiffs fail to meaningfully refute.[114] Moreover, the Eleventh Circuit has recognized "reasonably limit[ing] the cost of detention" as a legitimate penological interest, notwithstanding the Plaintiffs' protestations to the contrary.[115] In short, the Plaintiffs' evidence cannot give rise to the inference that the challenged conditions are unconstitutional punishments. The Supervisory Defendants are entitled to qualified immunity on the grounds that the Plaintiffs cannot show that their policies violated the decedent's constitutional rights.

### b. Clearly Established Law

Even if the Plaintiffs could establish that the decedent's constitutional rights were violated, they cannot establish that the Supervisory Defendants violated clearly established law. For the law to be so clearly established as to overcome qualified immunity, it must have "earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates

---

[114]    The Plaintiffs insist that protecting inmate privacy is not a legitimate penological interest because inmates' privacy rights are substantially curtailed while incarcerated. Pls.' Mot. for Partial Summ. J., at 10-11 [Doc. 142]. But the Plaintiffs' discussion of the privacy rights of inmates is beside the point. The Supervisory Defendants may well have an interest in preserving inmate privacy even if the inmates do not have a right to demand privacy.

[115]    *Hamm*, 774 F.2d at 1573.

federal law."[116] For the purposes of determining whether the law is clearly established, this Court may consider only decisions from the Eleventh Circuit, the Supreme Court, and the Georgia Supreme Court.[117]

The Plaintiffs provide only two cases for this Court's consideration, neither of which are sufficient to overcome the high bar that the Eleventh Circuit has set for overcoming a defendant's claim of qualified immunity. In *Hale v. Tallapoosa County*, the plaintiff was placed in a 13-by-20-foot "bullpen" with over a dozen other inmates, none of whom were segregated based on their proclivity for violence.[118] The plaintiff, who was booked for failure to appear, was attacked by a detainee booked for murder and attempted murder.[119] The sole corrections officer tasked with monitoring the bullpen checked in only twice over a five hour period.[120] In short, the facts of *Hale* are not sufficiently similar to those in this case to have given the Supervisory Defendants notice that their policies violated clearly established law.

---

[116]     *Jenkins by Hall v. Talladega City Bd. of Educ.*, 115 F.3d 821, 823 (11th Cir. 1997) (quoting *Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146 (11th Cir. 1994)).

[117]     *Id.* at 826 n.4.

[118]     50 F.3d 1579, 1580-81 (11th Cir. 1995).

[119]     *Id.*

[120]     *Id.*

The facts of *Marsh v. Butler County, Ala.* are even further removed from those presented in this case.[121] In *Marsh*, the plaintiffs were assaulted and injured by prisoners at the Butler County Jail. The plaintiffs raised the following claims regarding conditions at the jail:

> 1) there was no segregation of nonviolent inmates from violent inmates, pretrial detainees from convicted criminals, juveniles from adults, or inmates with mental disorders from those without mental disorders, 2) at times the Jail housed more prisoners than the cells could accommodate, 3) the Jail was routinely understaffed, 4) no head counts of prisoners were made to make sure they were all accounted for, 5) locks on cell doors were not functional, allowing inmates to roam freely at all hours of the day, 6) homemade weapons were readily available by fashioning weapons from material torn from the dilapidated structure of the Jail, 7) no lock down of prisoners in their cells occurred at any point during the day or night, 8) cells were not visually inspected, 9) no jailer was assigned to maintain prisoners' security on the second floor where most of the inmates were housed, 10) the Jail was not operated in accordance with written policies, 11) inmates were not screened for mental health, medical conditions or conflicts with other prisoners before entering the Jail, and 12) prisoners were not disciplined or segregated when they attempted to escape, threatened jailers, destroyed property or assaulted other inmates.[122]

These conditions reflect a total abdication of the jail officials' duty to classify, supervise, and otherwise protect the inmates and detainees at the Butler County Jail. But, precisely because the alleged conditions are so shocking, *Marsh* is of little assistance to the Plaintiffs in establishing that the Supervisory Defendants violated clearly established law. *Marsh*, like *Hale*, could not have

---

[121]    268 F.3d 1014 (11th Cir. 2001).

[122]    *Id.* at 1029.

put a reasonable jail official on notice that an "objective" classification system or lack of continuous supervision could violate inmates' constitutional rights. Thus, the Plaintiffs cannot meet their burden of showing that the Supervisory Defendants violated clearly established law.

## C. The County

The Plaintiffs seek to hold the County liable for "systemic conditions of confinement" at the Jail that create an unreasonable risk of inmate-on-inmate violence.[123] The Plaintiffs challenge (1) elements of the Jail's structure that make it difficult to continuously observe inmates; (2) an alleged policy of underfunding the Jail resulting in the Jail being understaffed; (3) an allegedly inadequate classification system; and (4) an alleged failure to investigate the causes of in-cell assaults.[124] And, as already covered in the forgoing discussion of the claims against the Supervisory Defendants, the Plaintiffs assert that they need not show that the County or any of its policymakers were deliberately indifferent to an objectively substantial risk of serious harm.

Notwithstanding the Plaintiffs' insistence that the County and the Supervisory Defendants are jointly and severally liable for each of the challenged conditions, this Court holds that the County cannot be found liable for constitutional violations arising from the challenged housing and

---

[123]     Pls.' Mot. for Partial Summ. J., at 1.

[124]     Pls.' Resp. Br. to County and Supervisory Defendants' Mot. for Summ. J., at 2-3.

classification decisions or from the alleged failure to investigate and ameliorate the causes of in-cell assaults. Under Georgia law, the Sheriff, and not the County, is responsible for the day to day operation of the jail.[125] In matters of jail administration, the Sheriff is an arm of the state and his actions cannot give rise to County liability when he acts in his capacity as jail administrator.[126] The County has no authority to establish or modify the jail's housing and classification policies. Nor can the County require the Sheriff to engage in "systemic reviews" or investigate in-cell assaults.[127] As such, this Court will assess only those claims concerning matters over which the County had the final say–namely, the Jail's structure and funding.

The County is liable under § 1983 if its policies or customs were the "moving force" behind a constitutional violation.[128] The plaintiff must show "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional

---

[125]    *Purcell*, 400 F.3d at 1325.

[126]    *Id.*

[127]    The Plaintiffs argue that the classification system is a "County practice pursuant to its medical duty[.]" Pls.' Resp. Br. to County and Supervisory Defendants' Mot. for Summ. J., at 21. For the same reasons that CorrectHealth is not liable for harm arising from the classification system, the County is not liable for the same.

[128]    *Monell*, 438 U.S. at 694.

right; and (3) that the policy or custom caused the violation."[129] Georgia counties have statutory duties involving "jail structure[,] inmates' food, clothing, and medical necessities."[130] The Plaintiffs argue that, because this is a conditions of confinement claim, they need not show that the County was deliberately indifferent to the risk that its policies or customs would give rise to unconstitutional conditions of confinement.[131] This Court need not reach the question of whether the County was deliberately indifferent, however, because the Plaintiffs cannot clear the first hurdle of showing that the challenged conditions of confinement were unconstitutional. As already discussed in the context of the Supervisory Defendants' liability for inadequate supervision, the Constitution does not require that double-celled inmates be continuously observed. It follows that elements of the Jail's design that make continuous observation difficult cannot give rise to liability for the County. As for the Plaintiffs' argument concerning underfunding, the Plaintiffs have not shown that staffing levels at the Jail fall below constitutional minima. There is also no evidence in the record suggesting that more officers would have been assigned

---

[129]    McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (*citing City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

[130]    *Manders*, 338 F.3d at 1322.

[131]    Pls.' Mot. for Partial Summ. J., at 8-9.

to the night shift if the County had provided additional funding.[132] The Plaintiffs' argument that the County's jail design and funding decisions are not related to a legitimate penological interest is foreclosed by the Eleventh Circuit's holding in *Hamm* that "reasonably limit[ing] the cost of detention" is a legitimate penological interest.[133] Therefore, the County is not liable under § 1983 for the challenged conditions or policies.

## IV. Conclusion

For the forgoing reasons, (1) the Defendants CorrectHealth, LLC, James Rose and Walter Smith's Motion for Summary Judgment [Doc. 137] is GRANTED; (2) the Defendants Clayton County, Kemuel Kimbrough, Garland Watkins, Robert Sowell, and Samuel Smith's Motion for Summary Judgment [Doc.138] is GRANTED; and (3) the Plaintiffs' Motion for Partial Summary Judgment [Doc. 139] is DENIED.

---

[132]     The Plaintiffs make much of the fact that a housing unit at the Jail was closed at the time of the assault. Pls.' Reply Br. in Supp. of Mot. for Partial Summ. J. [Doc. 186]. The Plaintiffs argue that, had the housing unit been open, jail officials would have been able to single-cell assaultive detainees. But whether assaultive detainees could have been housed in the closed unit is irrelevant. Brooks was classified as a medium security, non-assaultive inmate and so would not have been single-celled even if the option were available. Thus, there is no possible way in which the closure of the housing unit could have caused the decedent harm.

[133]     *Hamm*, 774 F.2d at 1573.

SO ORDERED, this 28 day of September, 2018.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge